## THE STATE OF NEW HAMPSHIRE

MERRIMACK,SS                                          SUPERIOR COURT

```
* * * * * * * * * * * * * * * * * *
                                   *
Edgar Clifford Avery,Jr.,Plaintiff *
                                   *
v                                  *      Civil Action No._____
                                   *
Chris Sununu,Governor,State of New *
Hampshire,Helen Hanks,Commissioner,*
New Hampshire Department of Cor-   *      DEMAND FOR JURY TRIAL
rections (NHDOC),John Hanson,Ad-   *
ministrator of Logistics and Serv-*
ices,NHDOC,Bernice Campbell,As-    *      PLEASE EXPEDITE BECAUSE OF
sistent Director,Medical and Fo-   *      COVID-19 INSIDE NEW HAMP-
rensic Services,NHDOC,Defendant,   *      SHIRE STATE PRISON
et al. All Defendants are sued in  *
their individual and official      *
capacities                         *          DEC 2 1 2021
                                   *
* * * * * * * * * * * * * * * * * *        By_____
```

## COMPLAINT UNDER THE CIVIL RIGHTS ACT,42 U.S.C. 1983

### PARTIES

1.  Plaintiff Edgar Clifford Avery,Jr.is a prisoner of the State,

his address is PO Box 14,Concord,New Hampshire 03301

2.  Defendant Chris Sununu's address for purposes of this action is

State House,North Main Street,Concord,New Hampshire 03301.

3.  Defendants Helen Hanks,John Hanson and Bernice Campbell,their

address for purposes of this action is New Hampshire Department of

Corrections,PO Box 1806,Concord,New Hampshire 03302-1806.

### JURISDICTION

4.  Jurisdiction is conferred by 28 U.S.C. (1343)(3) and (4) 2201

and 2202. This Court has concurrent jurisdiction with the federal

district court of New Hampshire.

## BRIEF DESCRIPTION OF DEFENDANT'S DUTIES AND ACCOUNTABILITIES

5.   Defendant Sununu,as Governor of New Hampshire,pursuant to Part 2,article 41 of the New Hampshire Constitution,among other things he "shall be responsible for the faithful execution of the laws. He may,by appropriate court action or proceeding...enforce compliance with any constitutional...violation of any constitutional...right, by any officer,department or agency of the State..."

6.   Defendant Hank¯ as Commissioner of NHDOC,pursuant to State law RSA 21-H:8,"shall manage all operation of the department and administer and enforce the laws with which the commissioner or the department is charged" Defendant Hanks also "shall report directly to the governor." Pursuant to RSA 622:7,Duties of Commissioner of Corrections: "It shall be the duty of the commissioner of corrections to receive,safely keep...all convicts...until discharged according to law."

7.   Defendant Hanson,among other things,is responsible for managing "department-wide facilities physical plant maintenance, (ensuring) that facilities...and services meet safety standards,ensures proper adherence to...Departmental Policies...Ensure inspections are...performed by City,County and State officials pertaining to fire safety, air quality,food services etc  at all facilities and directs action to remedy any and all deficiencies,while maintaining safety of staff and persons under departmental control,Authorizes and implements policies related to maintenance,heating...food services...safety, sanitation and hygiene in order to meet federal,state,local and ACA Standards for all department facilities."

8.  Plaintiff does not have any document that indicates what duties Defendant Campbell is required to perform as an employee of NHDOC.

GROUND ONE:

UNCONSTITUTIONAL CONDITIONS OF CONFINEMENT COMPOUNDED BY OVERCROWDING AND THE COVID-19 PANDEMIC THREATEN THE HEALTH,SAFETY AND LIVES OF PLAINTIFF AND ALL OTHER PRISONERS

Supporting Facts:

9.  Medium Custody North (MCN) and Medium Custody South (MCS). These units consist of three floors each with four "pods" to a floor. Each consists of ten cells,a common dayroom,and a bathroom. Each cell was designed for one (1) prisoner. Each cell on the three floors houses two (2) prisoners. The twelve pods within each unit share a common airflow system which circulates air and heat between the pods.

10.  The ventilation systems (air exchangers) in the prisoners housing units of MCN and MCS are supposed to be a closed system of ducts for the purpose of supplying heat and fresh air to the living areas.

11.  Removal of allergens is accomplished through a system of filters. When the ducts are compromised this cannot happen. There is gross deterioration throughout the entire duct system of both housing units. Many areas of the ventilation/duct system have holes. There is such extreme deterioration that one can push their hand right through the duct work. As prisoner Elmer Lee Barron, maintenance worker said: "I have observed leaking floors above machinery for the heat and air exchangers. A lot of the duct work has huge holes in it where it has rusted out. This causes the air exchangers to draw dust,dangerous mold and stale air from the chase way with

little or no ventilation. Particles of rust are everywhere. The
plumbing leaks all over exposing the chase way floors to raw sewage
which threatens the health and safety of myself as well as all
other inmates living in the unit. Further,the floor in the bathroom
area of my housing unit (MCN) as well as many other units,have not
been properly grouted for so long that holes in the floor hold
water and bacteria as well as urine. These serious sanitary condi-
tions endanger the health and well being of myself as well as all
other inmates in these housing units." *NOTE: The area where water,
air and steam enter the building and behind all toilets and showers
where they drain is called a chase way. SEE Affidavit of Elmer Lee
Barron, appendix (app.) page 1.When the toilets get plugged and
backup into the chase ways this sewage evaporates and is then sucked
into the ventilation/duct system,and this noxious material becomes
part of the air Plaintiff and all prisoners breath.

12.  These two housing units as well as others in NHSP are in a very
serious state of deterioration and a serious state of disrepair and
fail to meet minimal health and safety needs of Plaintiff and all
other NHSP prisoners.

13.  The grossly inadequate ventilation,especially in the cells and
shower areas,results in excessive odors,heat and humidity with the
effect of creating stagnant as well as excessive mold and fungus
growth,thereby facilitating personal discomfort with health and
sanitation problems. This lack of adequate ventilation and air flow
undermines the health,well being and lives of Plaintiff,all other
prisoners and the sanitation of the prison.

14.  Such gross deterioration of the ventilation systems forces the
Plaintiff and other prisoners to breathe noxious and/or unhealthy

-4-

air on a daily basis.

15.  Many prisoners in these sick housing units have respiratory problems and Plaintiff asserts many are caused by breathing this noxious air everyday. Plaintiff also asserts that other serious medical conditions such as vision problems,headaches,memory problems etc are caused from breathing this unhealthy air.

16.  Plaintiff asserts that this noxious air aggravates those prisoners medical conditions such as asthma,chronic obstructive pulmonary disease (COPD) bronchitis.

17.  All year long and more so during the fall and winter seasons, when prisoners contract colds,flu and various respiratory illnesses, Plaintiff believes this unhealthy air causes these illnesses to exacerbate and increases their normal duration as opposed to being in an environment free of such noxious air. Additionally,many prisoners who contract a cold or some respiratory illness,find that when they are over it,it returns a second time and is worse. Plaintiff believes this is attributable to the grossly inadequate ventilation/duct system.

18.  Moreover,the spread of such sickness to other prisoners living on the same pod as well as on other pods in the same unit is very rapid. Again,Plaintiff attributes this to the inadequate ventilation/duct system.

19.  A large contributing factor to the deterioration of the ventilation,duct and plumbing systems. Is the fact that both MCN and MCS housing units were originally designed-rated for a total capacity of 120 prisoners each unit. For decades 2 prisoners have been living in each cell. Also,there are four (4) bunk beds set up on each

-5-

pod in the common dayroom area consisting of four (4) prisoners.
Thus the population of prisoners in the MCN and MCS units is more
than double the design-rated capacity of each unit.

20. This overcrowding of prisoners in each housing unit has over-
taxed,overworked and overwhelmed the ventilation,duct and plumbing
system to the seriously decrepit state it is today.

21. Lastly,another major contributing factor to the decrepit state
of these housing units. Is the fact there are only two (2) water
closets (toilets) for each of the 24 prisoners living on each pod.
There are only two (2) lavatory sinks per pod. There are absolutely
no service sinks in any of the pods.

22. According to the International Plumbing Code Book (IPCB),un-
der Code 403.1 Prisons,the code requires 10 toilets per pod or 1 for
each cell,10 lavatory sinks per pod or 1 for each cell and 1 service
sink for each pod.

23. This more than doubling of the prisoner capacity of these two
housing units,as opposed to the originally designed total capacity
of 120 prisoners per unit,the absence of the appropriate number of
toilets,lavatory sinks and service sinks,has egregiously overtaxed,
overworked and overwhelmed the ventilation,duct and plumbing sys-
tems into a gross state of decrepitude that it is and has been for
decades and in need of immediate maintenance.

24. The potentially deadly COVID-19 has entered NHSP officially
on December 8,2020. As of today. Decmber 11,2020-there are 30 pri-
soners who have contracted the virus. While many people outside of
prison in the public community as a whole who contract COVID-19
are able to recover without the need of hospitalization,those who
become seriously ill from the virus may require hospitalization,

-6-

intensive treatment,and ventilator support. Serious cases are most likely to occur among the elderly and those with underlying medical conditions.

25.  Plaintiff is 74 years of age and has serious medical conditions including cardiac conditions which put him at a heightened risk of death or serious injury from COVID-19. There are many other prisoners in like circumstances or worse with some suffering from terminal diseases. Due to the structure of NHSP,and the unconstitutional conditions of confinement,compounded by the grave overcrowding and the deadly COVID-19 Pandemic,all prisoners at NHSP,regardless of age and medical conditions are at high risk of contracting COVID-19.

26.  The World Health Organization declared COVID-19 a pandemic on March 11,2020,noting the "alarming level of spread and severity" and "alarming levels of inaction" in response to the virus.

27.  The best way to slow and prevent spread of the virus is through social or physical distancing,which involves avoiding human contact, and staying at least six feet away from others. Even vigilant efforts to improve personal hygiene are not enough to slow the spread of COVID-19. Consequently,most institutions in this country have either dramatically reduced the number of people in close quarters or closed entirely.

28.  Prisons and jails have long been associated with inordinately high transmission probabilities for infectious diseases. Early on, physicians,public health officials,and the national Centers for Disease Control and Prevention sounded the alarm that prisons and jails could become the "epicenter of the COVID-19 pandemic." (E.g Klonsky, An Epicenter of the Pandemic Will Be Jails and Prisons,if inaction Continues,N.Y.Times (March 16,2020).

-7-

29.  Infections transmitted through droplets,like COVID-19,are par-
ticularly difficult to control in correctional facilities,as ade-
quate physical distancing and decontamination of surfaces is usually
impossible. Prisons and jail populations are at additional risk due
to double celling and the existence of domitories,dining halls,re-
ception centers,gymnasiums,and other congregate spaces are accessi-
ble to most prisoners,including aged and chronically ill prisoners.
NOTE: Plaintiff lives in a cell with another prisoner. The cell was
originally designed for only One (1) prisoner and this is why it is
only 60 square feet. Outside Plaintiff's cell is a common dayroom
area which is 418 square feet and this space is reduced to 280 square
feet not only from the bunk beds but from chairs,wheelchairs and
medical walkers used by the 4 prisoners who occupy this area. This
shrinkage of square footage in the dayroom is due to Defendant Hank's
and Hanson's  approval of adding 4 bunk beds to each of the twelve
pods that were already severely overcrowded.

30.  Plaintiff and other prisoners cannot engage in social or phys-
ical distancing,avoid human contact nor stay at least six feet away
from other prisoners. This is due in large part to the gross over-
crowding. Moreover,prior to Plaintiff's pod,1A being placed on quar-
antine status because a prisoner on his pod tested positive for COVID.
The pod,2A above Plaintiff's was in quarantine status. because a pris-
oner on that pod had tested positive for COVID. Due to the grossly
inadequate ventilation/duct system. Plaintiff as well as all other
prisoners on 1A breathe the same air as those living on pod 2A. Also,
pod 3A not on quarantine status yet breathe the same air as prisoners
living on pods 1A and 2A,all three pods breathing the same air and
air that is noxious and/or unhealthy.

-8-

81. Physicians and public health authorities regularly warn that prisons '"are in no way equipped to deal with an outbreak once it gets in. If an institution is already operating at far beyond its capacity,(like NHSP),it is going to be very difficult to find areas where prisoners with suspected COVID-19 can be isolated."' According to a New York Times database,as of June 2020,nine of the 10 largest known clusters of the virus in the United States were inside correctional institutions.

GROUND TWO:

CONDITIONS OF NHSP FOOD SERVICE DEPARTMENT ARE UNCLEAN, UNSANITARY,UNHEALTHY AND UNCONSTITUTIONAL AND POSE AN IMMEDIATE THREAT TO PLAINTIFF"S AND ALL NHSP PRISONER'S HEALTH,SAFETY AND THEIR LIVES

Supporting Facts:

32. There is a major safety and health law(s) violation in the Food Service Department (Kitchen) of NHSP. The kitchen roof above the food preparation areas,When it rains or when snow and ice melt. Contaminated waste water,i.e biological matter drips down onto the areas where pots and pans are stored;onto food preparation areas; onto carts loaded with food that pass under the leaking areas;onto kitchen workers and directly onto the kitchen floors. On a couple occassions this biological waste matter actually dripped into food being prepared to serve NHSP prisoners.

33. Plaintiff made complaints to Defendant Hanks and other prison officials,State legislators and Jeffrey Meyers,Commissioner of New Hampshire Department of Health and Human Services (DHHS), Subsequently,NHSP maintenance department put several tarps under the leaking areas. This makeshift action is completely nugatory because:

-9-

In the center of each of these 7 tarps is a hose. This allows the leaking biological matter to run through these hoses and empty the toxic and noxious matter directly onto the floors of the kitchen. NOTE: This biological waste matter comes mostly from leaks in the walkways of the prison. These walkways are filthy from numerous persons walking,spitting and bird defecation. When it rains or snow and ice melt,this toxic mess runs through the roof and ceilings of the kitchen. The roof and ceilings also contain harmful materials harmful to one's health.The waste matter is walked in by prisoners working in the kitchen,civilian chefs and correctional staff. It is then tracked/deposited from these person's footwear throughout the entire kitchen,thus contaminating other areas such as the food serv-ing lines. Many times when it rains heavy the biological waste mat-ter flows over the edges of the tarps down onto the floors,onto workers,onto food preparation areas,carts loaded with food. On one occassions Plaintiff observed one of the tarps break free from its restraint due to the weight of this waste matter and the heavy rain. The tarp crashed down onto a food preparation area and where food is stored,splashing and soaking the foods and food preparation areas. With the tarps gone it was literally raining biological waster mat-ter down into the bakery area. Other prisoners working in the kitch-en including civilian chefs witnessed this event. Plaintiff saw a civilian chef take a photograph of this area after the tarp had fell down and the raining waste matter was subsiding.On another occassion, in December 2019,waste matter suddenly began leaking so forcefully down into the "breakroom" where prisoners working in the kitchen eat their meals,the force was so strong,compounded by a deteriorated

-10-

kitchen,that ceiling tiles crashed down with the waste matter onto the wooden tables and wooden benches. This incident was witnessed by two correctional officers. The wooden tables and benches being cracked and porus cannot be adequately cleaned and sanitized and because of this they are unclean,unsanitary and unhealthy for prisoners to be using,but remain in the breakroom.

34.  Some of this dripping waste matter drips down onto the tarps, then evaporates. It then becomes airborne and blown out the sides of the tarps by huge fans onto food being prepared for NHSP prisoners. Prisoners working in the kitchen,food preparation areas,food being moved to serving lines,pots,pans and other food serving utensils are contaminated with this biological waste matter. When prisoners leave the kitchen this waste matter is tracked into their housing units on their footwear and clothing.

35.  Some of this waste matter is circulated throughout the kitchen via the inadequate ventilation system. This occurs because the leaks are close to the vents and the tarps keep the waste matter in close proximity to the ceiling and ventilation vents.

36.  Public Health inspectors as well as some civilian chefs at NHSP have said that if such horrendous conditions were found to exist in restaurants and other food service businesses in the public sector they would be immediately shutdown until they were fixed.

37.  The sections of NHSP kitchen,i.e.leaking roof areas,must as a matter of law(s) be shutdown until it is repaired and not reopened until all safety,health laws and codes of New Hampshire and DHHS are met.

38.  There are many other conditions in the kitchen that constitute

-11-

a threat to the safety and health of all NHSP prisoners: (1)The dish-
washer is inadequate  and when it is not functioning properly which
is often. Plaintiff has observed food trays,bowls and cups coming out
with old food caked and stuck inside the trays,bowls and cups. These
unclean food trays,bowls and cups are then taken to the food serving
lines where they are used to serve food to all NHSP prisoners. (2)
Often the kitchen worker who takes these unclean trays,bowls and
cups to the serving lines is also handling garbage and garbage cans
to be taken to an area for disposal. (3) There are open garbage cans
throughout the kitchen. Garbage cans,bags full of garbage are moved
together on the elevator (whenever its working which is not often),
and when not working the same carts used to transport food are used
to transport garbage and not cleaned and sanitized between these two
tasks. (4) There is mold in the dishwasher room and other areas in
the kitchen.The floors where food is served to prisoners has lost
most of the grout. This allows food,dirt and water to settle in the
gaps  and creates a breeding ground for mold and bacteria. (5) In
the bakery the tables used to make bread,pastries and other food pro-
ducts have holes and cracks in them. Because of this the tables cannot
be adequately cleaned and sanitized. (6) Cutting boards used to cut
vegtables and other food have many cut marks in them from the knives.
This makes it impossible to properly and adequately clean and sani-
tize them. These boards are frequently not cleaned and sanitized be-
fore other food items are proceesed on the boards which allows for
cross contamination. (7) Where pots,pans and other food utensils are
washed there is no sanitizing machine. Plaintiff has observed on many
occassions grease and old food left on the food utensil,foods that
are days old,in the corners of pans and inside pots. Many of the pots,

-12-

pans and cooking sheets are decades old,dented and have an accumu-
lation of decades old burned on grease and foods.

GROUND THREE:

IMPROPER,ILLEGAL DELIVERY OF MEALS TO PRISONERS
AND ILLEGAL ACTS OF DEPRIVING PRISONERS OF FOOD

Supporting Facts:

39.  There are a number of inmates for various reasons who cannot
go to the prison dining hall for their meals so their meals are de-
livered to them in their respective housing units. These meals are
commonly referred to as "cell feeds."

40.  For many years these cell feeds have been transported to pris-
oners in filthy milk crates often contaminated with bird feces. The
cell feed food items were placed in paper bags,styrofoam containers and
lugged by prisoners to the housing units. This method exposed the
food containers to all elements of the weather such as rain,freez-
ing rain and snow. The rain,freezing rain and snow would fall down
onto the food containers. The food,already lukewarm or cold became
colder. The paper bags became soggy from the inclement weather.
Prisoners literally would have to brush ice and snow off their meal
containers. The bags as well as the food inside was wet and soggy
and not edible.

41. Recently,  MCN cell feed recipients received soup with their
lunch meals in styrofoam cups. The cups were stacked in two layers
inside the unclean milk crates. On numerous occassions the first
layer of cups were tipped over on their sides spilling out the con-
tents on the top as well as onto the second layer of cups. Cell feed
recipients then would have to go through this mess looking for a cup

-13-

of soup that has not spilt. Plaintiff filed a grievance about this as well as other issues regarding cell feed delivery and cell feed recipients not being provided food that is served to those prisoners who are able to go to the prison dining room for their meals. Defendant Hank and her subordinates and agents response to this was to simply stop providing cell feed recipients soup with their meals! Currently, there are 853 prisoners receiving cell feeds due to the COVID 19 pandemic. Now soup is <u>another</u> food that is being deprived to cell feed recipients. Cell feed recipients are deprived daily of food that is provided to those prisoners who go to the dining rooms for their meals. Examples: Whenever yogurt,fresh or canned fruit, oatmeal,chocolate milk is served to those going to the dining room it is never provided to cell feed recipients. Just about every morning apple juice is served at breakfast for those prisoners who go to the dining but not to cell feed recipients.

42. On a daily basis food that is legally required to be served hot is not but is served lukewarm and most often cold as if the food just came out of a refrigerator. Cold food that is legally required to be served cold is frequently warm. Examples: packaged cookies or other snacks or desserts are melted inside their wrappers. This is because they are improperly put inside the styrofoam food containers and then improperly put into a warmer in the kitchen hours before the cell feeds are delivered to cell feed recipients. Cake is often warm and is mixed into whatever the meal is:mashed potatoes and gravy. The cake being warm, takes : on the taste of potatoes and gravy is unappealing to eat. Again, this is because the cake is put into the styrofoam containers,then into the kitchen warmers.

43. Pursuant to a settlement agreement on April 23,2001,Defendant Hanks and her agents,among many other things, are legally required to:

-14-



"make their best efforts to ensure that food which is supposed to be served hot will be served hot and all food which is supposed to be served cold will be served cold." Moreover,Defendant agreed that: "All inmates regardless of their custody and disciplinary status, will be served the same quality of food in a quantity sufficient to meet their nutritional needs." To date Defendants Hanks and Hanson have miserably and deliberately failed to abide by these requirements with complete impunity. Quoting page 60 of State court settlement agreement. Defendant and her agents continue to flagrantly disobey the settlement agreement and now are not providing cell feed recipients with soup in their meals that all prisoners receive when they go to the NHSP dining rooms for their meals. On July 9,2019 Plaintiff filed in this Court a Petition For Enforcement Of A Settlement Agreement ("Petition"),Avery v Hanks 217-2018-CV-00404. Among many other things Plaintiff raised the issues of improper delivery of cell feeds and other prisoners being deprived of foods by Defendant Hanks. This Court,(Ruoff,PJ) dismissed the Petition stating Defendants had immunity and that Plaintiff lacked standing to enforce compliance with the terms and provisions of the settlement agreement. Plaintiff appealed this Court's decision and on November 20,2020 the NH Supreme Court reversed and remanded the case back to this Court. The Supreme Court held that Plaintiff did have standing and that Defendant did not have immunity,Avery v Commissioner,No.2019-0051.

44.  On November 30,2020 Plaintiff sent Defendant Hanks a copy of a Grievance he had filed regarding the cell feed issues and a notice of intent. Plaintiff informed Defendant if the cell feed issues were not corrected he would amend the Petition and add intervenors particularly

-15-

those prisoners receiving cell feeds and seek compensatory and puni-
tive damages from those NHDOC employees responsible for and not cor-
recting the cell feed problems.

Subsequent to Plaintiff's November 30 notice of intent,cell
feeds began being delivered in an enclosed (but unheated) receptacle.
The cell feeds are now placed inside this receptacle rather than the
milk crates. However,nothing else has been done to ensure hot food
is served hot and cold foods served cold. Nothing has been done to
correct the issue of cell feed recipients being deprived of the food
that is given to those prisoners going to the dining room. Moreover,
unclean milk crates are still being used _after_ the meals are deliv-
ered to MCN. The paper bags and styrofoam containers are removed
from the receptacle and placed in milk crates. These milk crates are
used to lug the food containers to prisoners receiving cell feeds and
live in one of the twelve pods in MCN. The milk crates are often
taken from the MCN yard where birds fly over,perch on them,defecate
on them and peck at scraps of food left on the milk crates from the
previous day. These unclean,unsanitary and unhealthy milk crates are
then placed onto a walkway that is filthy from numerous persons walk-
ing,spitting and bird defecation. The milk crates (with meals inside),
sit on this walkway anywhere from 8 to 10 minutes while the food gets
colder then when it was deliverd,as the prisoners go back and forth
to the different pods delivering the meals.

45.   As of December 8,2020, Plaintiff receives cell feeds. This is
because a prisoner living in the same pod tested positive for COVID
19. Due to the COVID-19 pandemic and prisoners testing positive for
the virus there are now more then 853 prisoners receiving cell feeds.
46.   In the midst of the COVID-19 pandemic. Plaintiff and other
prisoners have and continue to be deprived of food,served cold food

-16-

that is legally required to be served hot and cold food that is sup-
posed to be served cold is often warm and melted. Moreover, the food
is being served in an unsanitary and unhealthy manner. In a civilized
society governed by laws,such actions should not be tolerated by this
Court.

The acts and omissions as described under Ground Two constitutes
a deprivation of Plaintiff's and all other prisoners rights to equal
protection of the laws and constitutes  cruel and unusual punishment
in violation of the Fifth,Eighth and Fourteenth Amendments to the
Federal Constitution and Part 1,articles 1,15 and 33 of the New Hamp-
shire Constitution and violates substantive due process requirements
under the Fourteenth Amendment to the Federal Constitution and Part
1,articles 1,15 and 33 of the New Hampshire Constitution.

GROUND  FOUR:

IMPROPER ACTIONS OF NHDOC EMPLOYEES THAT THREATEN
THE HEALTH,SAFETY AND LIVES OF ALL NHSP PRISONERS
AS WELL AS ALL CORRECTIONS STAFF AND THEIR FAMILIES

Supporting Facts:

47.  As a safety measure to keep the deadly COVID-19 virus from en-
tering NHSP,Defendant Campbell as well as other NHDOC employees take
the temperature of all corrections staff before they are permitted
to enter NHSP and work their shifts.

48.  Defendant took the temperature of a staff member and the tem-
perature was 100.1 degrees. Such a temperature is an indication that
a person may have COVID-19 or is a-symptomatic. Defendant Campbell
told this staff member to go back outside (in the cold) for a few
minutes. The person did so and when this staff member's temperature
was again taken by Defendant it was 97.7 degrees and Defendant per-
mitted this person to enter NHSP to work.

-17-

49. Another safety measure implemented by Defendant Hanks is to ask NHSP employees before they are allowed to enter NHSP for work, the question whether they had come in contact with anyone that had tested positive for COVID-19. If the employee answers truthfully and says yes they are told thats the wrong answer  and that they must say no because NHSP is so understaffed that they cannot afford to lose anymore staff.

Such acts and omissions of Defendant Campbell are clearly improper and threatens the health,safety and lives of all NHSP prisoners,and all NHSP corrections staff as well as their families and friends. Such acts of Defendant endangering all prisoners constitutes cruel and unusual punishment under the Eighth Amendment to the Federal Constitution,and Part 1,article 33 of the New Hampshire Constitution,and violates substantive due process requirements under the Fourteenth Amendment to the Federal Constitution and Part 1,article 15 of the New Hampshire Constitution.

-18-

GROUND 5:     INADEQUATE FUNDING OF NHDOC HAS CAUSED AND
              EXACERBATED CONDITIONS OF CONFINEMENT THAT
                 ARE UNSAFE AND UNCONSTITUTIONAL

Supporting Facts:

50. On June 15,2016,Michael A.Zenk,former Warden of NHSP,stated to
NHSP prisoners: "The DOC is not adequately funded to maintain oper-
ations at the level required for both the safety of the institution
and the programming to support rehabilitation and quality of life."
Two years after Warden Zenk made this statement,the understaffing
of NHDOC and NHSP had not improved. In fact,the lack of adequate
funding of the DOC was worse. NHSP corrections staff were being
forced to work more and more forced overtime. They were forced to
work 16 hours a day and up to 5 days a week. The outrageous op-
pressive amounts of overtime cost taxpayers millions of dollars of
overtime and it continues today. The NHDOC rather then fill many
vacant correction  staff positions,pays millions of dollars in
forced overtime.

51.  Defendant Sununu has a duty to adequately fund the NHDOC not
only so institutional order can be maintained and public safety but
so certain services and programs will be provided to Plaintiff and
all NHSP prisoners. Defendant's failure to adequately fund the NH
DOC resulted in gross understaffing which resulted in the complete
loss of an egregious number of services and programs that are le-
gally required by a State court settlement agreement to be provided
Plaintiff and all NHSP prisoners. This forced Plaintiff to file the
Petition in this Court referred to at page 15 supra. Moreover,this

-19-

lawsuit <u>Avery</u> v <u>Hanks</u>,217-2018-CV-00404 and <u>Avery</u> v <u>Commissioner</u> 2019-0051,has cost the taxpayers a large sum of money that could have been saved had Defendant Sununu,adequately funded the NHDOC.

52.   Defendant Sununu's failure to adequately fund the NHDOC has resulted in the egregious and continuing deterioration of the prisoner's housing units and kitchen to the point that both the housing units and kitchen are unsafe and unconstitutional as described in Grounds 1 and 2 of this action. Moreover,Defendant's failure to adequately fund the NHDOC exacerbated the conditions of confinement because NHSP maintenance department was deprived of adequate funding to accomplish adequate repairs to the existing symtoms. For the egregious loss of services and programs due to the gross underfunding of the NHDOC,<u>See</u> <u>Avery</u> v <u>Hanks</u> and <u>Avery</u> v <u>Commissioner</u>,supra.

53.   The Defendant,as Governor of New Hampshire under Part 2,article 41 of the New Hampshire Constitution "is responsible for the faithful execution of the laws." The intent of Article 41 is to impose a duty upon the Governor to enforce constitutional requirements. The NHSP prisoner housing units are sick and allegedly making all prisoners sick. The NHSP kitchen is terminally ill and in its decaying and dying state poses an immediate threat to the health and safety of all NHSP prisoners.

Numerous violations of many laws regarding the deplorable conditions of the kitchen have for many years and continuing today, to be completelyignored and flagrantly violated with complete impunity.

Violations of the Plaintiff's and and prisoner's constitutional rights in the MCN and MCS housing units have for years been violated

-20-

and continue with impunity.

Defendant Sununu has failed to perform his duties under Part 2, Article 41 of the New Hampshire Constitution.

54.  Defendant Hanks,as Commissioner of NHDOC,has both a statutory duty as well as a constitutional duty to safely keep all convicts until discharged,according to law. SEE RSA 622:7,see also RSA 21-H 18. Defendant Hanks also has a duty under the Federal and States Constitutions not to violate Plaintiff's and all other prisoners' constitutional rights. This lawful and constitutional duty is anti- thetical with the deplorable conditions of confinement. Defendant Hanks has and continues to subject Plaintiff and other prisoners to violations of their rights as described in Grounds 1 and 2 of this action.

55.  For years Defendant Hanks has failed to obey the law by delib- erately failing to honor and comply with the terms and provisions of the settlement agreement of April 21,2001 referred to at page 15 supra. Defendant's egregious failure to obey the settlement agree- ment deprived Plaintiff and numerous other prisoners of many serv- ices and programs and a host of other rights and benefits. Defen- dant's failure to honor the settlement agreement's terms and provi- sions required Plaintiff to file his Petition in this Court on July 9,2019.

56.  The acts and omissions of Defendant Hanks as described above and in Grounds 1 and 2 constitutes maladministration of NHDOC. More- over said acts and omissions have threatened the safety,health and lives of Plaintiff and other NHSP prisoners. Said acts and omissions subject Plaintiff and other prisoners to cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution

-21-

and Part 1,article 33 of the New Hampshire Constitution,and sub-
stantive due process under the Fourteenth Amendement to the United
States Constitution and Part 1,article 15 of the New Hampshire Con-
stitution.

57.   Defendant Hanson has flagrantly,egregiously,miserably and de-
liberately failed to fulfill his job responsibilities as required
by his Supplemental Job Description and the Constitutions and laws
of New Hampshire and the United States. A look at the deplorable
and unconstitutional conditions of the NHSP kitchen and the priso-
ners housing units as described in Grounds 1 and 2 of this action
clearly shows Defendant Hanson's years long failure(s) as Director
of Logistics and Services. His incompetence has caused and exacer-
bated these deplorable conditions. His failure(s) to provide any
competent corrective actions for the conditions has placed all NHSP
prisoners as well as all corrections staff's health and safety in
jeopardy.

     Defendant Hanson's acts,omissions and failures constitutes
maladministration of the NHDOC.

     Defendant Hanson's acts,omissions and failures have subjected
Plaintiff and all NHSP prisoners to cruel and unusual punishment in
violation of the Eighth Amendment to the United States Constitution
and Part 1,article 33 of the New Hampshire Constitution,and sub-
stantive due process under the Fourteenth Amendment of the United
States Constitution,and Part 1,article 15 of the New Hampshire Con-
stitution.

58.   The conditions of confinement of the housing units and kitchen
of NHSP constitutes a grave and immediate threat to the health,
safety and lives of Plaintiff and all other prisoners who live in
these sick housing units and eat their meals from the kitchen. The
conditions of confinement as described in Grounds 1 and 2 are un-
constitutional. Additionally,with respect to the COVID-19 Pandemic,
the conditions expose Plaintiff and other prisoners to an unreason-
able risk from COVID-19. Plaintiff claims,among other things,that
Defendants Sununu and Hank's failure to take readily available steps
to reduce the NHSP incarcerated population to safe levels so as to
permit adequate physical distancing within the walls of NHSP consti-
tutes cruel and unusual punishment in contravention of the Eighth
Amendment of the United States Constitution and Part 1,article 33
of the New Hampshire Constitution,and violates substantive due pro-
cess requirements under the Fourteenth Amendment to the United
States Constitution and Part 1,article 15 of the New Hampshire Con-
stitution.

   **WHEREFORE,**based upon the above and foregoing,Plaintiff respect-
fully request the Court for the following relief:

   A)   Plaintiff requests the Court to expedite the proceesing of
this action and give it high priority on the Court's docket. Because
as of today,December 16,2020,152 prisoners in NHSP have contracted
COVID-19.

   B)   Issue a declaratory judgment that Defendants Sununu,Hanks
and Hanson have acted with deliberate indifference in two respects:

-23-

(1) Allowing the conditions to exist without providing any corrective action to abate them. (2) Failing to reduce the NHSP population as have many other states to protect the health,safety and lives of NHSP prisoners,the health of correctional facility staff, the health of health care staff,and the health of the community as a  whole from the COVID-19 Pandemic.

C)  Order Defendant Sununu and Hanks to immediately commence the design and implementation of plans to expedite release of a number of prisoners necessary to reduce the population to where only one (1) prisoner is living in a cell which is the originally design-capacity.

D)  That the plans include the Adult Parole Baord to immediately implement a framework for the early release of several groups of prisoners. Identify prisoners to be considered for parole or medical parole: prisoners who are at least 60 years of age or older;who possess an underlying medical condition that heightens their risk of death or serious injury from COVID-19;who were denied parole within the last year;whose sentence will end within ninety days or who will be eligible for parole within ninety days.

E)  That home confinement be used as a means of reducing the prison population.

F)  That Defendant Sununu initiate action that will result in prisoners being able to request from the State courts early reduction of sentence,suspension of sentences and compassionate release.

G)  Order that: (1) The NHSP kitchen be immediately shutdown until the roof areas that leak biological waste matter is fixed and meets all the health,safety laws and codes of New Hampshire and DHHS. (2) Order a temporary kitchen be used until the conditions

-24-

complied with.

H)  Order Defendant Hanks to immediately: (1) Ensure that food which is supposed to be served hot will be served hot and all food which is supposed to be served cold will be served cold. (2) Order Defendant to provide cell feed recipients the same food and drink products that all prisoners who go to the prison dining rooms are provided. (3) Order Defendant to immediately began using a heated food transport receptacle to deliver meals to cell feed recipients in all NHSP housing units.

I)  Fine the Defendant $5,000 per day until all the above in H is accomplished.

J)  Order Defendant Hanks to immediately remove each and every one of the bunk beds in all of the pods of MCN and MCS.

K)  Fine the Defendant Hanks $25,000 a day until all the bunk beds are removed.

L)  Issue a preliminary and permanent injunction enjoining all Defendants,their agents,successors in office, from harassing or engaging in any retaliation against Plaintiff for having exercised his constitutional right in filing with the Court this lawsuit.

M)  Issue a declaratory judgment that the Defendants acts and omissions as described in Grounds 1 through 4 violate the Plain- tiff's rights under the Eighth Amendment to the United States Con- stitution,and Part 1,article 33 of the New Hampshire Constitution, violates substantive due process requirements under the Fourteenth Amendment to the United States Constitution and Part 1,article 15 of the New Hampshire Constitution.

-25-

N)   Grant Plaintiff compensatory damages in the amount of ten million dollars ($10,000.000) dollars each from Defendants Sununu, Hanks,Hanson and Campbell for a total amount  of forty million ($40,000.000) dollars.

O)   Grant Plaintiff punitive damages of twenty five million dollars each from Defendants Sununu,Hanks,Hanson and Campbell for a total amount of one hundred million dollars ($100,000.000) dollars.

December 16,2020

Respectfully submitted,

*Edgar Clifford Avery, Jr.*

Edgar Clifford Avery,Jr.,Pro se
Post Office Box 14
Concord,New Hampshire 03301

I declare under penalty of perjury that the foregoing informa-
tion is true and correct.

December 16,2020

*Edgar Clifford Avery, Jr.*

-26-

## ADDENDUM TO CIVIL COMPLAINT UNDER 42 U.S.C. 1983

Now comes the Plaintiff,Edgar Clifford Avery,Jr., and with this Addendum includes an additional request for relief from Defendant Chris Sununu which is as follows:

1.   That Defendant Sununu urge the New Hampshire legislature to enact a good time law. Such a law could be applicable to a very large percentage of NHSP prisoners. The law could be made retroactive as far back as declared by the legislature. The good time law would allow for hundreds of NHSP prisoners to be quickly released and thereby reducing the NHSP population in a quick manner.

Dated: December 17,2020

Respectfully submitted

*Edgar Clifford Avery, Jr.*

Edgar Clifford Avery, Jr.
Post Office Box 14
Concord,New Hampshire 03301

DEC 2 8 2020

By _____

-27-

## APPENDIX

                                                                    <u>PAGE</u>

Affidavit of Elmer Lee Barron . . . . . . . . . . . . . . . . . 1-3